# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

|  |  |
|---|---|
| BRIAN J. and G.J., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED HEALTHCARE INSURANCE COMPANY, <br><br> Defendant. | **MEMORANDUM DECISION AND ORDER** <br><br> Case No. 4:21-cv-42 <br><br> Howard C. Nielson, Jr. <br> United States District Judge |

Plaintiffs Brian J. and G.J. filed this lawsuit against United Healthcare Insurance Company asserting two claims under ERISA (the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq*): (1) a claim for payment of improperly denied benefits, and (2) a claim for violations of the Mental Health Parity and Addiction Equity Act. Both parties move for summary judgment. For the following reasons, the court grants Defendant's motion in part and denies it in part, denies Plaintiffs' motion, and remands the case to United for further consideration of Plaintiffs' claim for payment of improperly denied benefits.

## I.

Plaintiffs were members of a group health benefits plan issued by United: Brian J. was a participant in the Plan, and his daughter, G.J., was a beneficiary. *See* AR 1480; Dkt. No. 24 ¶ 6; Dkt. No. 20 ¶ 2.[1] Under the Plan, United is a fiduciary with respect to benefits determinations and payments and shares "responsibility for administering the plan." AR 1480; *see also* AR 23.

---

[1] References to the administrative record are cited as "AR XXX." The administrative record was conventionally filed on a flash drive with the Clerk's Office and all documents were served upon the parties by email. *See* Dkt Nos. 21–22.

The Plan expressly covers "medically necessary" mental health services "at a residential treatment facility." AR 1433. In assessing whether mental health services are "medically necessary" —and thus whether a claim for mental health benefits is covered under the Plan— United's reviewers consult the "Optum Level of Care Guidelines: Mental Health Conditions." These guidelines are "objective and evidence-based behavioral health criteria" "derived from generally accepted standards of behavioral health practice." AR 1.

To be admitted for covered care at a residential treatment center, the Optum guidelines require that (1) the member satisfy the "common admission criteria for all levels of care," (2) the member not be "in imminent or current risk of harm to self, or others, and/or property," and (3) the member's symptoms "cannot be safely, efficiently, or effectively assessed and/or treated in a less intensive setting." AR 10. Continued treatment at a residential treatment center is covered only if (1) the member satisfies the continued stay criteria for all levels of care, including by undergoing "active treatment"—which requires, among other things, that the "member's family [be] engaged to participate in the member's treatment"—and by remaining "[]willing and []able to participate in treatment," AR 2–3, 10, and (2) the continued treatment "is not primarily for the purpose of providing custodial care," including "non-health-related services," "health-related services provided for" meeting "personal needs" or "maintaining a level of function" instead of "improving that function," and services that can be "safely and effectively" administered by non-medically trained personnel, AR 10.

When G.J. was eleven years old, she began attending weekly therapy sessions to address behavioral issues. *See* AR 40. She was diagnosed with attention deficit hyperactivity disorder and oppositional defiant disorder, and although she continued to attend therapy and take medication, her behavior did not significantly improve. *See* AR 40. From the fall of 2016 to the

spring of 2017, G.J.'s behavioral and substance abuse problems included being arrested for drug possession at school, staying out until 3:00 AM without her parents' permission, repeatedly hitting her sister, regularly smoking marijuana and drinking alcohol, shoplifting, selling her prescription medications, skipping school, and stealing from her parents. *See* AR 40–42.

On April 13, 2017, G.J. was admitted to Solacium Sunrise, a residential treatment center. *See* AR 1179–80. As recorded in United's internal notes, on April 14, G.J.'s attending doctor listed her diagnoses as "Major depressive [disorder], [r]ecurrent episode[s] [with] psychotic features," "[u]nspecified cannabis-related [disorder]" and "[o]ppositional defiant [disorder]." *Id*. These notes also indicate that her symptoms at that time included depression, anxiousness, hopelessness, defiance, and stubbornness but that symptoms of suicidal or homicidal ideation were not present. *See* AR 1180. United's internal notes further recorded that a lower level of care was not recommended because G.J. was "not motivated," there was "turmoil in [her] home," she was "becoming more abusive with [her] sister," and she had a "tendency to run away." *Id.* Based on this clinical information recorded in its internal notes, United found that G.J. met the criteria for admission to a residential treatment center, authorized four days of treatment, and informed Sunrise that additional days could be requested and authorized upon subsequent review. *See* AR 1181. On April 17, United approved four additional days. *See* AR 1182.

On April 25, G.J.'s diagnoses no longer included major depressive disorder or mentioned psychotic features and were listed as "Bipolar I, current/most recent episode hypomanic, [u]nspecified," "[u]nspecified cannabis-related [disorder]," "[o]ppositional defiant [disorder]," and "[u]nspecified attention-deficit/hyperactivity [disorder]." AR 1183. Based on these diagnoses, and because G.J. continued to exhibit symptoms and have behavioral issues— including depression, anxiousness, racing thoughts, rambling speech, restlessness, mood swings,

stubbornness, slamming doors, pestering and being disrespectful to Sunrise staff members, throwing pillows at a peer and calling that peer a profane name, and refusing to control her temper—United approved treatment at Sunrise on three separate occasions from April 25 to May 9, 2017. *See* AR 1182–92. United's notes indicate that G.J.'s doctors reported the absence of suicidal or homicidal ideation each time United approved coverage. *See id.*

Given that G.J. had not yet started medication during her treatment at Sunrise, *see* AR 1182, 1184, 1187–89, 1191–93, and that she had "made minimal progress in 27 days of care," United determined that she was "not expected to improve without medications" and sent her case to a peer-to-peer review to determine whether continued treatment should be covered. AR 1194–96. On May 11, 2017, Dr. Theodore Allchin conducted the peer-to-peer review and determined that "the requested service does not meet the Optum level of care guideline[s] and common criteria." AR 1198. In his internal notes, he stated that

> there are no medical issues or withdrawal signs. There's no self-injurious thoughts, aggression, or psychosis. There is active participation in treatment. Family is involved and supportive. Symptoms appear stable. Care could continue in the mental health outpatient setting.

*Id.* In his denial letter, Dr. Allchin informed Plaintiffs that, "[b]ased on the Optum Level of Care Guidelines and common criteria for Mental Health Residential Treatment Center Level of Care, . . . no further authorization for treatment can be provided from 05/10/2017 forward" because,

> [a]fter talking with her provider, it is noted she has made progress and that her condition no longer meets the guidelines for further coverage of treatment in this setting. There are no medical issues. She is active in her treatment. Her family is supportive. She is not a danger to self or others. Her symptoms are better. She could continue care in the Mental Health Outpatient Program setting.

AR 73.

Brian J. filed an internal appeal of Dr. Allchin's adverse benefit determination.

*See* AR 39–68. Dr. Sherifa Iqbal reviewed the appeal and upheld Dr. Allchin's decision.

*See* AR 1205–06. In her internal notes, she summarized G.J.'s case as follows:

> It is noted in the records that the anticipated length of stay for the member would be 7–9 months indicating long term treatment. At the start of the appealed dates, the member continued to have behavioral issues. Her therapist felt that she needed medications for her symptoms but the patient was ambivalent and the provider wanted more time to assess the "real" patient prior to starting medication. Medications were not started until about a month later. Throughout the next few months of treatment, the patient continued to have behavioral issues and sporadic acting out. She was not wanting to harm herself. She did not want to harm others. She was not aggressive. She appeared engaged in some groups and engaged in her individual therapy sessions. Low dose lamictal was started in June but it was then discontinued quickly because the patient didn't like the side effects. The member was then started on low dose seroquel at her request. Titration of this was minimal and slow.
>
> In summary, it appears that the patient was admitted to a long term residential setting of at least 7 months duration. She displayed sporadic acting out that was consistent with chronic behavioral issues likely related to her ODD diagnosis. Medication treatment was markedly delayed. She was not wanting to harm herself. She did not want to harm others. It seems that her care could have continued in a less intensive setting.

AR 1206. In her letter providing her decision and rationale for upholding Dr. Allchin's noncoverage determination, she stated only that

> [t]he non coverage determination for residential level of care will be upheld on 5/10/2017 and forward. This is based on Level of Care Guidelines for Residential Treatment of Mental Health Disorders and the Common Criteria and Clinical Best Practices for All Levels of Care Level of Care Guidelines. Your child did not want to harm herself. She did not want to harm others. She was engaged in her individual therapy. It appears that her care could have continued in a less intensive setting.

AR 23.

Brian J. subsequently filed an external appeal of the noncoverage determination

with the Illinois Department of Insurance. *See* AR 3584–95. This external appeal was

completed by an independent review organization. *See* AR 3578. The external reviewer

upheld United's decision to discontinue coverage for treatment at Sunrise because

> as of 5/10/17, the patient was oppositional with staff at times, but not engaging in consistent episodes of suicidal ideation, homicidal ideation and the patient was not psychotic. There was concern for hypomania and pressured speech with some insomnia, but the patient was not on medications and the patient was not engaging in sexually inappropriate behaviors or severe impulsive and risky behaviors that would warrant a 24 hour therapeutic environment. The patient had no previous suicide attempts or hospitalizations. The patient had no withdrawal concerns that needed to be monitored and the patient was medically stable. The patient did eventually start some medication that did help her mood and continued therapy and family therapy was beneficial, but there is no indication that a 24 hour therapeutic environment was medically necessary.

AR 3582.

Having exhausted their administrative remedies, Plaintiffs brought this suit.

## II.

When both parties in an ERISA case have "moved for summary judgment and stipulated

that no trial is necessary, summary judgment is merely a vehicle for deciding the case; the factual

determination of eligibility for benefits is decided solely on the administrative record, and the

non-moving party is not entitled to the usual inferences in its favor." *LaAsmar v. Phelps Dodge*

*Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796

(10th Cir. 2010) (quotation marks omitted). The court reviews a denial of benefits covered by

ERISA "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary

discretionary authority to determine eligibility for benefits or to construe the terms of the plan."

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

Generally, "[w]here the plan gives the administrator discretionary authority, . . . [courts]

employ a deferential standard of review, asking only whether the denial of benefits was arbitrary

and capricious." *LaAsmar*, 605 F.3d at 796 (quotation marks omitted). Under Illinois law,

6

however, health insurance policies may not "contain a provision purporting to reserve discretion to the health carrier to interpret the terms of the contract." ILL. ADMIN. CODE 50 § 2001.3. The Seventh Circuit has held that this Illinois law is not preempted by ERISA. *See Fontaine v. Metropolitan Life Ins. Co.*, 800 F.3d 883, 887 (7th Cir. 2015).

In this case, the Plan contains language that purports to give United discretion to interpret the terms of the Plan. *See* AR 1481. But because the Plan is governed by Illinois law, *see* AR 1331, this language lacks legal effect, and the court will therefore review United's determination *de novo*.[2] The court must thus "determine whether the administrator made a correct decision." *Niles v. American Airlines, Inc.*, 269 F. App'x 827, 832 (10th Cir. 2008) (quotation marks omitted).

### III.

The court begins with Plaintiffs' claim for payment of improperly denied benefits. The parties dispute both whether Plaintiffs are barred from filing this lawsuit under the terms of the Plan and whether United correctly denied Plaintiffs' claim for benefits. The court will first address the parties' dispute regarding the terms of the Plan.

### A.

The parties dispute the legal effect of a provision of the Plan that states that "[a]ll decisions by the independent review organization are deemed as binding on us, and on you to the extent that you have other remedies available under applicable federal or state law." AR 1395. United argues that this provision bars Plaintiffs' ERISA claim because Plaintiffs "requested an external review[,] and . . . the independent external review agency upheld United's denial" and

---

[2] Despite initially arguing for the arbitrary and capricious standard of review, United ultimately conceded that *de novo* review is appropriate in this case. *See* Dkt. No. 42 at 6.

Plaintiffs thus "waived their rights under federal and state law and are bound by the adverse decision of the external reviewer." Dkt. No. 20 at 15–16. The Illinois Health Carrier External Review Act, however, provides that "[a]n external review decision is binding on the health carrier . . . [and] on the covered person *except to the extent* the covered person has other remedies available under applicable federal or state law." 215 ILL. COMP. STAT. 180/45 (emphasis added). Plaintiffs argue that this "statute expressly preserves the ability of the insured to pursue other state and federal law remedies" including "a claim under ERISA in federal court." Dkt. No. 51 at 3. United contends that the Plan's terms, rather than the Illinois statute, control here and that the Plan does not contain a similar exception. *See* Dkt. No. 50 at 2–4. The court agrees with Plaintiffs.

First, the notice of the right to external review provided with United's second denial letter acknowledges that United is "*required by law* to accept the determination of the" external reviewer. AR 25 (emphasis added). If, as United appears to concede, the Plan must comply with Section 180/45's mandate that an external reviewer's decision binds the insurer, the court cannot think of any logical reason why the Plan can disregard other portions of Section 180/45, including the exception that allows an insured to pursue available federal or state remedies despite an external reviewer's adverse decision. In other words, the court sees no sound basis for permitting an insurer to contract out of one part of Section 180/45 even though it undisputedly may not contract out of another part of the very same statutory provision. Certainly nothing in Section 180/45 states or suggests that any portion of this provision is permissive or can be altered or eliminated by contract. The court thus concludes that the statutory language providing that "[a]n external review decision *is binding . . . except* to the extent the covered person has other

remedies available under applicable" is best read to create both a mandatory rule and a mandatory exception to that rule.

Second, the Illinois External Review Act gives covered persons the right to request an external review of an adverse coverage determination. *See* 215 ILL. COMP. STAT. 180/5, 20, 25. The Act thus creates a regulatory scheme similar to Section 125/4-10 of the Illinois Health Maintenance Organization Act—the Illinois statute at issue in *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355 (2002). Under that statute, if a primary care physician and a Health Maintenance Organization dispute whether a covered service is "medically necessary," the physician can seek an opinion from an independent physician. If the third-party physician determines that the covered service is medically necessary, the HMO is bound by that decision. 215 ILL. COMP. STAT. 125/4-10. The Supreme Court held that Section 125/4-10 is not preempted by ERISA because it does not "supplement or supplant" a "cause of action" or "form of ultimate relief" authorized by ERISA. *Rush Prudential*, 536 U.S. at 378–80 (cleaned up).

Under United's reading of Section 180/45—which would permit plans to eliminate a member's right to sue to recover benefits after an adverse decision by an external reviewer—the statute would allow insurance companies to supplant a remedy available under Section 502 of ERISA. Section 180/45 would thus be preempted by ERISA because it would allow a prohibited "alternative remedy" rather than merely authorize a procedure "akin to a mandate for second-

opinion practice" that does not supplant judicial review of claims for benefits. *Rush Prudential*, 536 U.S. at 379, 384.[3]

Based on the plain language of Section 180/45, and because United's reading of Section 180/45 would create a forbidden alternative remedy, the court concludes that the entirety of Section 180/45 is mandatory and that United cannot through the terms of its Plan eliminate the statute's exception that allows insureds to pursue ERISA claims despite adverse rulings by external reviewers. It follows that Plaintiffs' claims are not barred even though they requested an independent external review of United's denial of their claim for benefits that resulted in a determination that G.J.'s treatment at Sunrise was not medically necessary.

---

[3] United argues that in *Rush Prudential*, the Court recognized that "federal law allows for a binding external review process, which the Plan has adopted here by contract," Dkt. No. 50 at 3, because the Court stated that an independent external review "may well settle the fate of a benefit claim under a particular contract," 536 U.S. at 379. But this dictum cannot reasonably be understood to suggest that an ERISA plan may eliminate its member's right to file a claim for the wrongful denial of benefits in federal court. First, the statute at issue in *Rush Prudential* provides that an independent reviewer's determination whether a covered service is "medically necessary" is binding *only on the HMO*. *Id.* at 361 (quoting 215 ILL. COMP. STAT. 125/4-10). That statute does not preclude *a plan member* from filing an ERISA claim for the wrongful denial of benefits if the independent reviewer determines that the covered service is not medically necessary. *See id.* Indeed, the suit in *Rush Prudential* was brought by an insured after an independent reviewer determined that a contested treatment was medically necessary *and the HMO refused to accept that determination*. *See id.* at 362–63. Second, as already discussed, it was precisely because the statute does not supplement or supplant remedies available under ERISA that the Court held that Section 125/4-10 is not preempted by ERISA. The dictum upon which United places great weight can thus be understood to mean only that under Section 125/4-10's external review procedure, an independent reviewer's determination that a covered service *is medically necessary* "may well settle the fate of a benefit claim." In all events, the Court's central holding—that state statutes that provide an independent external review process for denied benefits claims are not preempted by ERISA so long as they do not supplement or supplant ERISA remedies—has no bearing on whether United can eliminate Section 180/45's exception and thus effectively preclude Plan members who exercise their state-law right to external review from filing ERISA claims in federal court.

**B.**

The court now addresses the merits of Plaintiffs' claim for payment of improperly denied benefits. Again, the court reviews United's decision to deny Plaintiffs' claim for coverage of benefits *de novo* "to determine whether the administrator made a correct decision." *Niles*, 269 F. App'x at 832 (quotation marks omitted). In reviewing United's determination, the court is limited to the rationale given by United for the denial of benefits. *See Kellogg v. Metropolitan Life Ins. Co.*, 549 F.3d 818, 828–29 (10th Cir. 2008) (applying *de novo* review). "Remand is appropriate if the administrator failed to make adequate factual findings or failed to adequately explain the grounds for the decision" but "the evidence in the record" does not "clearly show[] that the claimant is entitled to benefits." *Carlile v. Reliance Standard Life Ins. Co.*, 988 F.3d 1217, 1229 (10th Cir. 2021) (applying *de novo* review) (quotation marks omitted).

Based on G.J.'s reported symptoms and initial diagnosis, United authorized treatment at Sunrise effective April 13, 2017, because it determined that G.J. satisfied the guidelines and other criteria for coverage of mental health care at a residential treatment center. Over the next 27 days, without any significant change in G.J.'s reported symptoms and only a minor change to her initial diagnosis, United approved coverage for additional days of treatment at Sunrise three separate times.

On May 10, 2017, United decided to send G.J.'s case to a peer-to-peer review because it determined that G.J. "ha[d] made minimal progress" and was unlikely "to improve without medications." AR 1195. The next day, after the peer-to-peer review, Dr. Allchin stated in his determination letter that G.J. had "made progress" and was no longer eligible for covered treatment at Sunrise under the guidelines or the common criteria because "there are no medical

issues," "she is active in her treatment," "her family is supportive," "she is not a danger to self or others," and "her symptoms are better." AR 1198 (cleaned up).

For the following reasons, the court concludes that Dr. Allchin misstated the factual record and failed to provide an adequate explanation for his decision. First, Dr. Allchin based his denial of continued coverage at least partly on circumstances that were also present each time United previously approved coverage. For example, he relied on the absence of certain symptoms— "danger to self or others" and "medical issues"—that United's own internal notes make clear G.J. also lacked each time it previously approved coverage. According to those internal notes, G.J. never reported or exhibited symptoms of suicidal ideation or homicidal ideation. United thus knew that she was not a "danger to self or others" every time it found that G.J. was eligible for covered treatment at Sunrise. In addition, Dr. Allchin's internal notes suggest that his statement in his letter that there were "no medical issues" may have been a reference to G.J.'s lack of "withdrawal signs." AR 1198. But although G.J. had used controlled substances—mostly marijuana—before being admitted at Sunrise, nothing in the administrative record indicates that she ever had withdrawal symptoms. And nothing in United's internal notes from each time it approved coverage before suggests that G.J. had any other sort of medical issues—as opposed to mental health and behavioral issues—at any time. Similarly, while G.J.'s family may have been supportive when Dr. Allchin conducted his review, the administrative record makes clear that her family had been supportive and actively involved in her treatment at Sunrise from the beginning, and United never stated that a lack of family support was one of the reasons why it had previously determined that G.J. was eligible for covered treatment at

Sunrise.[4] It thus appears that United determined that G.J. met the criteria for covered treatment at Sunrise on multiple occasions despite G.J. not being a danger to herself or others or having withdrawal symptoms or other medical issues and her family being supportive.

Second, if G.J. did not actively participate in her treatment program, it appears she would not have met the requirement *for continued treatment* under the Optum guidelines that she be "[]willing and []able to participate in treatment." AR 3. And if G.J. lacked family support, she may well not have satisfied another criterion for continued treatment—that her family be "engaged to participate in [her] treatment." AR 2. The court has great difficulty understanding how satisfying criteria required for treatment to be covered can provide a sound justification for discontinuing coverage.

Finally, Dr. Allchin's statement in his letter that G.J.'s "symptoms were better" directly contradicts United's own internal notes—and even his observation that she had "made progress" is in substantial tension with those notes. United's internal notes summarizing the reports provided by Sunrise indicate that as of May 10—one day before Dr. Allchin's review—G.J. was still struggling to control her impulses and regulate her emotions and that she had recent behavioral issues including acting out when she could not find one of her shirts, being defiant and failing to take directions, being loud in class, provoking others, and interrupting staff. *See* AR 1195. Indeed, the internal notes reveal that the reason United sent G.J.'s case to the peer-to-

---

[4] To be sure, the internal notes state that there was "[c]onflict in [G.J.'s] home." AR 1180. And G.J. certainly had some problems with family members including calling her sister names, "physically hitting her sister," staying out until the early morning without permission, and stealing from her parents. *See* AR 40–42. But none of those things, and nothing else in the internal notes, suggest that her family did not support her receiving treatment. Rather, the internal notes show that despite the conflicts in the home, her family wanted her to get better. For example, they took her to Sunrise, *see* AR 1180, and were involved in her treatment at Sunrise by phone, *see* AR 1198.

peer review was that it had determined she had made only "*minimal* progress in 27 days," was "*still* acting out," and was "*not expected to improve* without medication"—which Sunrise had still not yet prescribed. *Id.* (emphases added).

  After Dr. Allchin made his adverse benefit determination, Plaintiffs filed an internal appeal. Dr. Iqbal reviewed the appeal and upheld Dr. Allchin's adverse benefit determination by merely citing the guidelines and stating that G.J. "did not want to harm herself," "did not want to harm others," and "was engaged in her individual therapy." AR 23. But again, during the entire course of treatment, United reviewed G.J.'s symptoms multiple times and decided that her treatment at Sunrise was covered, even though she had never reported or exhibited symptoms of suicidal or homicidal ideation. And her engagement in her treatment could not provide a legitimate reason for discontinuing coverage. Furthermore, the justification for upholding the denial of coverage proffered by Dr. Iqbal in her letter stands in jarring dissonance with her assessment of G.J.'s condition and the concerns that appear to have actually motivated her decision as reflected in her internal notes. For example, she noted that at the time of the denial of benefits and "[t]hroughout the next few months of treatment [G.J.] *continued to have behavioral issues and sporadic acting out*." AR 1206 (emphasis added). And Dr. Iqbal's internal notes strongly suggest that her true concerns with continued treatment at Sunrise were that G.J.'s "anticipated length of stay" indicated "long term treatment" of "chronic behavioral issues" and that "[m]edication was markedly delayed." *Id.*

  Because Dr. Allchin's and Dr. Iqbal's proffered reasons for their adverse benefit determinations were all (1) equally true when United previously approved G.J.'s treatment at Sunrise, (2) requirements for the *continuation* of coverage, or (3) directly contrary to United's own internal notes, the court concludes that United "failed to make adequate factual findings

[and] failed to adequately explain the grounds for [its] decision." *Carlile*, 988 F.3d at 1229.[5] The court cannot, however, conclude that "the evidence in the record clearly shows" that G.J. was "entitled to benefits" for her treatment at Sunrise under the Plan. *Id*. Although the rationales articulated in United's denial letters are patently insufficient to justify the denial of continued coverage at Sunrise in light of its previous coverage decisions, some of the rationales articulated in United's internal notes—for example, that G.J. was not making progress and that it had become increasingly clear that she was receiving long-term care for chronic behavioral issues— might perhaps justify a denial of coverage under the Optum guidelines, though the court certainly does not mean to suggest a considered opinion on this possibility.

The court thus remands the case to United to determine whether G.J. satisfied the guidelines and criteria for continued treatment at Sunrise, to make adequate factual findings, and to provide a candid and adequate explanation for whatever decision it reaches.

---

[5] The external reviewer found that coverage was not "medically necessary" because G.J. was not "engaging in consistent episodes of suicidal ideation" or "homicidal ideation," was not "psychotic," was not "engaging in sexually inappropriate" or "severe impulsive and risky behaviors," "had no withdrawal concerns that needed to be monitored," and "was medically stable." AR 3582. But as the external review itself acknowledges, "[p]rior to admission, the patient had no previous suicidal ideation, suicide attempts, self-injury, homicidal ideation or psychosis." AR 3579. And although her confinement at Sunrise may have limited her ability to engage in truly risky behavior, G.J. appears to have continued to engage in impulsive behavior both immediately before and after United denied further coverage. Finally, the court has found nothing in the administrative record indicating that G.J. ever had a significant problem with sexually inappropriate behavior or that she ever had withdrawal symptoms that required monitoring or was ever medically unstable. In all events, at least on the facts presented here, the court is inclined to agree with Judge Parrish's conclusion that "[r]ationales and factual evidence later cited by external reviewers cannot salvage deficient rationales or findings of fact provided by [United]." *David P. v. United Healthcare Ins. Co.*, 564 F. Supp. 3d 1100, 1122 (D. Utah 2021).

**IV.**

Finally, the court addresses Plaintiffs' Parity Act claim. In pertinent part, the Parity Act requires that "treatment limitations applicable to . . . mental health or substance use disorder benefits" be "no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan." 29 U.S.C. § 1185a(a)(3)(A)(ii). In addition, a plan cannot have "separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits." *Id.* For purposes of comparing treatment limitations, the regulations establish various "classifications" of levels of care and within each classification require consistent treatment of mental health or substance abuse care, on the one hand, and of medical or surgical care, on the other hand. *See id.* § 2590.712(c)(2)(ii)(A).

"To state a Parity Act claim, Plaintiffs must '(1) identify a specific treatment limitation on mental health benefits; (2) identify medical or surgical care covered by the plan that is analogous to the mental health or substance abuse care for which the plaintiffs seek benefits; and (3) plausibly allege a disparity between the treatment limitation on mental health or substance abuse benefits as compared to the limitations that defendants would apply to the covered medical or surgical analog.'" *J.W. v. Bluecross Blueshield of Texas*, 2022 WL 2905657, at *5 (D. Utah July 22, 2022) (cleaned up). "Disparate treatment limitations that violate the Parity Act can be either *facial* (as written in the language or the processes of the plan) or *as-applied* (in operation via application of the plan)." *Kurt W. v. United Healthcare Insurance Co.,* 2019 WL 6790823, at *4 (D. Utah Dec. 12, 2019) (cleaned up).

Plaintiffs first argue that there is a facial disparity between the Plan's requirements for mental health or substance abuse care and its requirements for analogous medical or surgical

16

care. Specifically, they contend that the Plan imposes requirements for residential treatment centers that are more stringent than the requirements for skilled nursing facilities. *See* Dkt. No. 24 at 34–35.

Ruling on this issue would not, however, redress Plaintiffs' injury. For regardless of whether the Plan imposes more stringent requirements on residential treatment centers than on skilled nursing facilities, United did not deny G.J.'s claim for continued treatment at Sunrise on the ground that Sunrise failed to meet the Plan's requirements for residential treatment centers. Rather, United denied Plaintiffs' claim for benefits because it determined that G.J. was not eligible for continued care at a residential treatment center. "It follows that Plaintiffs lack standing to raise this challenge." *J.W.*, 2022 WL 2905657, at *6.

Plaintiffs also assert an as-applied challenge. Specifically, they argue that although "United follows generally accepted standards of medical practice when it evaluates claims for the treatment of analogous medical/surgical claims," it deviates from such standards when it evaluates claims for mental health care in residential treatment centers. Dkt. No. 24 at 36–38.

Plaintiffs have failed, however, to identify any evidence of how the Plan evaluates claims for analogous medical or surgical treatment in practice or even any evidence, apart from G.J.'s own experience, of how the Plan evaluates claims for mental health care at residential treatment centers in practice. "Absent such evidence, Plaintiffs' as-applied challenge necessarily fails." *Anne M. v. United Behav. Health*, 2022 WL 3576275, at *11 (D. Utah Aug. 19, 2022).

Because Plaintiffs lack standing to raise their facial Parity Act argument and have not identified evidence sufficient to support their as-applied Parity Act argument, their Parity Act claim cannot survive Defendant's motion for summary judgment.

\*       \*       \*

For the foregoing reasons, the court **GRANTS** Defendants' motion for summary judgment with respect to Plaintiffs' Parity Act claims and **DENIES** it with respect to Plaintiffs' claim for payment of improperly denied benefits. The court **DENIES** Plaintiffs' motion for summary judgment. The court remands Plaintiffs' claim for payment of improperly denied benefits to United for reconsideration in accordance with this decision.

**IT IS SO ORDERED.**

DATED this 31st day of March, 2023

Howard C. Nielson, Jr.
United States District Judge